J-S40031-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: PETITION FOR CHANGE OF NAME OF H.J.M. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: ASHLEY LOTZ | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 907 EDA 2020 |

Appeal from the Order Entered February 25, 2020
In the Court of Common Pleas of Wayne County Civil Division at No(s):
No. 2019-00565

BEFORE:   SHOGAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED SEPTEMBER 25, 2020**

Appellant, Ashley Lotz ("Mother"), appeals from the order denying her petition to change the name of her son, H.J.M. ("Child"), to H.J.L. to allow Child to have Mother's last name, rather than the last name of his father, Joshua McCoy ("Father").  We affirm.

Mother filed the petition on November 12, 2019, and Father filed an answer opposing the proposed name change on January 28, 2020.  The trial court held a hearing on that same date, at which both Mother and Father testified.

The following factual background was developed at the hearing.  Child was born on April 20, 2014, and he was five years old on the date of the hearing.  Mother and Father were not in a romantic relationship at the time

_____

[*] Retired Senior Judge assigned to the Superior Court.

that Child was born, but had previously been in a relationship and had a daughter together, C.L., who is two years older than Child. N.T., 1/28/20, at 5-6. Mother explained that she gave C.L. her last name because she discovered that Father was still married when she was seven months' pregnant with C.L. *Id.* at 8. Mother testified that when Child was born, she and Father argued regarding which last name Child would be given, with Mother taking the position that Child and C.L. should only take Father's last name when Father completed his divorce. *Id.* at 8-9. Mother stated that Father at first begrudgingly accepted that Child would be named H.J.L., but when they left the hospital he announced that he would have nothing to do with Child or C.L. unless Child was given the McCoy name. *Id.* at 10. Mother relented three days later and they returned to the hospital to complete the birth certificate paperwork with Child identified as H.J.M. *Id.* at 10, 23.

Despite the fact that Child's legal name is H.J.M., Mother testified that Child has been known since birth, both at home and in the community, as H.J.L. *Id.* at 13, 15, 18. Mother stated that if Child was asked what his name is, he would identify himself as H.J.L. *Id.* at 15. At the hearing, Mother introduced Child's school, medical, financial, and baptismal records, which identify him with the Lotz surname. *Id.* at 8-9, 11, 13-15; Mother's Exhibits A, C-G. In addition, Father has identified Child as H.J.L. in filings in a custody matter involving Child. N.T., 1/28/20, at 15-16; Mother's Exhibit H. Mother testified that Father had only begun objecting to Child being identified with

- 2 -

the last name Lotz in the few months prior to the hearing. N.T., 1/28/20, at 16.

Mother is the primary custodian for Child and C.L. *Id.* at 12-13, 40. Father's visitation has fluctuated between unsupervised and supervised visits, and as of the date of the hearing he had unsupervised visitation with Child and C.L. one day per week for five hours. *Id.* at 12. In 2017, Mother married another man, Michael Krupa, and she kept her last name when they married to have the same last name as Child and C.L. *Id.* at 6-7. As of the date of the hearing, Mother and Mr. Krupa were expecting a child. *Id.* at 29. The parents had not decided whether the baby would take as a surname Lotz, Krupa, or a hyphenated version of both names. *Id.* Mother also had an older daughter from an earlier relationship who was given the father's last name. *Id.* at 28-29. Child also has a 19-year old half-brother on Father's side with the McCoy surname. *Id.* at 32.

Mother testified that she filed the petition to change Child's name to allow her, Child, and C.L. to share the same last name and avoid an identity crisis for Child if he became known as H.J.M. *Id.* at 18. Mother stated that she, Child, and C.L. "do everything" together and that Child is "super close" to C.L. *Id.* Mother testified that Child is aware of the "confusion with his last name" as Father and C.L. have both discussed it with Child. *Id.* at 19. Mother stated that she has a very strong bond with Child, and that Father was also bonded with Child, although their relationship was "strain[ed]" because of the limited visitation. *Id.* at 19-20. According to Mother, Father's relationship

did not suffer when he thought Child's last name was Lotz and changing Child's name would not affect his bond with Father. *Id.* at 20. Mother further testified that she was aware of no negative associations with the name Lotz that would negatively impact Child. *Id.* at 22.

Father testified that he had been under the understanding that Child had been given the last name McCoy at birth, but he also had received medical correspondence and other mail for Child with the Lotz name. *Id.* at 16. However, in 2016 when Child was two, Father obtained Child's social security card and confirmed that his legal last name was McCoy. *Id.* at 32. Father has communicated with Child's school that they should not refer to Child as Lotz but instead with his legal last name of McCoy. *Id.* at 34-35.

Father insisted that all of his children, including Child and C.L., have his last name. *Id.* at 34. He has asked Mother "[m]ultiple times" to change C.L.'s last name to McCoy, although he had never filed a petition to change Child's or C.L.'s name. *Id.* at 38. Father denied having told Mother shortly after Child's birth that he would not be involved in parenting Child and C.L. unless Child was given Father's last name. *Id.* at 39.

Father has always referred to Child as McCoy and never Lotz. *Id.* at 33. Father stated that Child knows his name is McCoy, "identifies with me as McCoy," and knows his half-brother's name is also McCoy. *Id.* at 32-33. However, Father believes that Child "is currently confused" by his last name. *Id.* at 41. Father testified that he had an "extremely close" bond with Child, and that his bond with Child would not be affected if the petition was granted.

*Id.* at 37, 42. However, Father believed that Child would be negatively affected if his name was changed to Lotz. *Id.* at 42.

Father testified that he and Child are direct descendants of Asa Harmon McCoy, the individual whose death sparked the Hatfield-McCoy family rivalry. *Id.* at 37. Father had explained this heritage to Child and stated that he believed it was "important for [Child's] understanding [of] his identity" to know that he was a McCoy. *Id.* at 32, 37.

On February 25, 2020, the trial court issued an opinion and order denying without prejudice the petition to change Child's name. The trial court found that Child will not be "negatively impacted by his school records being changed to match his legal name" in light of the short time he has spent in school. Trial Court Opinion, 2/25/20, at 2. The trial court further found that Mother's desire to have Child share his last name with his full sister C.L. "is not a determinative factor" because, regardless of whether the petition is granted or denied, Child will have siblings with whom he does not share a last name. *Id.* Finally, the court found that there is no social stigma associated with either the Lotz or McCoy last names, notwithstanding the "unique connection with American history" associated with Father's name. *Id.* The trial court accordingly concluded that Mother had "failed to meet her burden of coming forward with evidence that the name change requested would be in

[C]hild's best interest." *Id.* Mother filed a timely notice of appeal from the trial court's order.[1]

Mother raises the following issue for our review:

Did the trial court abuse its discretion in denying [M]other's request to formally change the surname of her five-year old son to the surname that the child has informally used his entire life when the child is known in the community and knows himself by the requested surname, the child's primary custodian and full sibling with whom the child is very close share the requested surname, and the requested change would not affect the father's bond with the child?

Mother's Brief at 4.

Our review of an appeal concerning a petition for name change is under an abuse of discretion standard. *T.W. v. D.A.*, 127 A.3d 826, 827 (Pa. Super. 2015).

An abuse of discretion exists if the trial court has overridden or misapplied the law, or if the evidence is insufficient to sustain the order. Further, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if those findings are supported by competent evidence. It is not enough for reversal that we, if sitting as a trial court, may have made a differing finding or reached a different result.

*Id.* (citations omitted).

In Pennsylvania, "[t]he court of common pleas of any county may by order change the name of any person resident in the county." 54 Pa.C.S. §

---

[1] Mother filed her statement of errors complained of on appeal on April 1, 2020. On April 15, 2020, the trial court filed a statement pursuant to Pa.R.A.P. 1925(a), in which it indicated that it was relying on the reasoning set forth in its earlier opinion.

702(a). Generally, courts adopt a "liberal policy" regarding name change requests and the "necessity for judicial involvement centers on governmental concerns that persons not alter their identity to avoid financial obligations."[2] *In re Change of Name of Grimes*, 609 A.2d 158, 160 (Pa. 1992). Our Supreme Court has explained that "courts reviewing petitions for change of name [should] exercise their discretion in such a way as to comport with good sense, common decency and fairness to all concerned and to the public." *Id.* (citation and quotation marks omitted).

In **Grimes**, our Supreme Court held that a trial court may not grant a petition to change the name of a minor child unless the court has determined that the proposed change is in the "best interest of the child in question." *Id.* at 160-61 (citation omitted). In adopting the best interest standard, the Court stated:

> Specific guidelines are difficult to establish, for the circumstances in each case will be unique, as each child has individual physical, intellectual, moral, social and spiritual needs. However, general considerations should include the natural bonds between parent and child, the social stigma or respect afforded a particular name within the community, and, where the child is of sufficient age, whether the child intellectually and rationally understands the significance of changing his or her name.

---

[2] Mother complied with the statutory requirements for a name change petition by attaching records from Wayne County and Pike County reflecting that no judgments or decrees have been entered against Child. **See** Petition for Name Change, 11/12/19, Exhibits A-D; **see also** 54 Pa.C.S. § 701(a.1)(4)(ii)(B) (providing that a petition must set forth that there are "no judgments, decrees of record or other similar matters against the petitioner").

*Id.* at 161 (citations omitted). The proponent of the name change bears the burden of demonstrating that the change would be in the best interest of the child. *Id.* at 161. "[W]here a petition to change a child's name is contested, the court must carefully evaluate all of the relevant factual circumstances to determine if the petitioning parent has established that the change is in the child's best interest." *T.W.*, 127 A.3d at 828.

Mother argues that the trial court abused its discretion in denying the petition and disregarded the evidence that she presented that showed that changing Child's last name to Lotz was in his best interest with respect to each of the three best interest considerations set forth in *Grimes*. First, Mother asserts that the evidence at the hearing showed that, contrary to the trial court's finding that both parents had a strong bond with Child, her bond with Child was stronger as a result of her being his primary custodian while Father had a more limited parental role in Child's life. As to the second consideration identified in *Grimes*, Mother argues that the trial court ignored the stigma associated with the McCoy name for its association with the "infamous feud between the Hatfields and the McCoys." Mother's Brief at 22. With respect to the final best interest consideration outlined in *Grimes*, Mother contends that Child identified using the Lotz name and that she feared he would suffer from an identity crisis if he were forced to use a different name at school and in the community.

In addition to these identified best interest considerations, Mother argues that the trial court disregarded other evidence that showed that Child's

name change was in his best interest. Mother asserts that the trial court "glosse[d] over the significance of abruptly switching Child's surname" in light of the fact that he had used Lotz for his entire life and nearly all of his important records reflected this name. *Id.* at 24. Furthermore, Mother maintains that the trial court overlooked the "embarrassment, discomfort, anxiety, and/or inconvenience" that Child will feel if he is not identified with the same family name as his only full sibling, C.L., with whom he has a "super close" bond. *Id.* at 25.

Upon a careful review of the record, we conclude that the trial court did not abuse its discretion in denying the petition to change Child's name. The main thrust of Mother's argument is that the trial court did not take sufficient account of the fact that Child has been known and knows himself as H.J.L. and it will be traumatic for Child to have to go by H.J.M. We agree with Mother that a Child's self-identified name is central to the trial court's best interest analysis. However, the evidence in this case does not clearly establish that Child exclusively knew himself as H.J.L. While Mother testified that she uses H.J.L. on forms and Child is known at school as H.J.L., Father testified that Child has known his name is H.J.M. "for quite some time" and he identifies to Father as H.J.M. N.T., 1/28/20, at 8-9, 11, 13-16, 18, 32-33. Indeed, both Mother and Father stated that Child is "confused" regarding his two last names. *Id.* at 18-19, 41. In rendering its decision, the trial court did not have the benefit of direct evidence relating to Child's understanding of his last name even though it appeared that Child, at least to some degree,

"intellectually and rationally underst[ood] the significance of changing his []
name." *See Grimes*, 609 A.2d at 161-62 (stating that, while the child as to
whom a name change was sought was only five years old, "an interview with
the child may have been helpful" in light of the conflicting testimony of his
parents). Given this record, therefore, we cannot say that the trial court
ignored competent evidence that Child was known and knew himself solely as
H.J.L.

Regarding the best interest consideration of "the natural bonds between
parent and child," *Grimes*, 609 A.2d at 161, both parents professed to have
a strong bond with Child, and Mother admitted that Father was bonded with
Child. N.T., 1/28/20, at 19-20, 37. Furthermore, neither parent indicated
that the bond would be impacted if they did not share a last name with Child,
and no evidence was presented that changing Child's name to match one of
his parents was necessary to strengthen the bond with that parent. Therefore,
this factor did not weigh strongly in favor of granting the petition.

Similarly, we agree with the trial court that the issue of having Child's
last name match that of his siblings "is not a determinative factor." *See* Trial
Court Opinion, 2/25/20, at 2. Child has an older full-sister, C.L., on Mother's
side, an older half-sister on Mother's side, an older half-brother on Father's
side, and Mother was expecting another child as of the date of the hearing, as
to whom a last name had not been decided as of the hearing. While changing
Child's last name to Lotz would have the benefit of him having a matching
name with his one full-sibling, C.L., Child would still not share a last name

with all of his siblings in Mother's family and he would no longer have a shared last name with his older brother on Father's side. Thus, as the trial court explained, "[r]egardless of [the c]ourt's determination, the minor child will have siblings with different last names than his." *Id.*

In addition, the trial court's finding that there is no stigma related to the Lotz or McCoy names is well-supported. No testimony was offered that either name had a negative association within the local community. While Mother maintains that Child may be harmed by taking a last name associated with a violent episode in this nation's history, the trial court correctly observed that any potential effect on Child from his association with the Hatfield-McCoy rivalry – whether positive or negative – is too attenuated to take into account in the best interest analysis.

Accordingly, we conclude that the trial court did not misapply the relevant law and its decision is supported by competent evidence. *T.W.*, 127 A.3d at 827. Therefore, pursuant to our "narrow standard of review," we affirm the trial court's order denying Mother's petition to change Child's name. *Id.* at 830.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/25/20

- 11 -